UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                              Case No. 14-59311

MAURICE M. GORGES,                                  Chapter 13

        Debtor.                          Judge Thomas J. Tucker
_____/

**OPINION REGARDING THE HUNTINGTON NATIONAL BANK'S MOTION
SEEKING SANCTIONS AGAINST THE DEBTOR'S ATTORNEY**

**I. Introduction**

      This Chapter 13 case was filed by the Debtor, Maurice M. Gorges ("Gorges") on

December 17, 2014.  The voluntary bankruptcy petition was signed by Gorges, and also by his

attorney, Stuart Sandweiss ("Sandweiss"), of the law firm Sandweiss Law Center, P.C. (the

"Sandweiss Firm"), and Sandweiss filed the petition for Gorges.[1]  Ultimately, Gorges voluntarily

dismissed the case, on motion and an order entered on March 4, 2015.[2]  At all times, at least until

the dismissal, Sandweiss represented Gorges as his attorney in this bankruptcy case.

      After the voluntary dismissal of this case, on March 10, 2015, a creditor, The Huntington

National Bank ("Huntington"), filed a motion entitled "The Huntington National Bank's Motion

to Set Aside Order Granting Debtor's Request for Voluntary Dismissal of Chapter 13 Case"

(Docket # 50, the "Motion").[3]  All aspects of the Motion have been resolved by orders of the

Court, except that part of the Motion that seeks an order "awarding sanctions in favor of

---

[1] Docket # 1.

[2] Docket ## 42, 43.

[3] The Motion amended and superceded the similar motion filed by Huntington on March 6,
2015, at Docket # 46.

Huntington and against the [Debtor's] counsel," based on the Debtor's alleged filing of this bankruptcy case in bad faith and for an improper purpose. The orders partially resolving the Motion were entered on March 20, 2015 and on April 6, 2015.[4] Among other things, those orders left the voluntary dismissal of this Chapter 13 case intact, so that the case remains dismissed, and sanctioned Gorges, by default, in the amount of $78,000.00.

The remaining, unresolved portion of the Motion (the "Sanctions Motion") seeks sanctions against Sandweiss personally, based on 28 U.S.C. § 1927, 11 U.S.C. § 105(a), and Fed. R. Bankr. P. 9011. Huntington is a creditor who had a mortgage on the home owned by Maurice and his wife, Hana Gorges, located at 13248 Maplelawn Drive, Shelby Township, Michigan (the "Real Property"). Huntington foreclosed on its mortgage, and after the redemption period expired without redemption, Huntington sought to gain possession of the Real Property. Huntington was thwarted in that effort, however, by various actions taken by Maurice and Hana Gorges, who continued to live in the home.

Huntington claims that as the attorney for Gorges, Sandweiss filed this bankruptcy case for the sole purpose of delaying Huntington's eviction of Gorges and his wife from the Real Property. Sandweiss denies this, and contends that his action in filing and prosecuting this bankruptcy case for Gorges was done in good faith for a proper, legitimate purpose.

In the Sanctions Motion, Huntington seeks sanctions in the amount of the reasonable attorney fees that it incurred, not only because of attorney Sandweiss's filing of this Chapter 13 bankruptcy case for Gorges, but also because of attorney Sandweiss's filing and/or defense of two *earlier* cases. The first of these was attorney Sandweiss's filing of a Chapter 13 case by

---

[4] Docket ## 53, 57.

2

Hana Gorges (Case No. 14-42250, the "Hana Gorges Bankruptcy"). That case was filed by Hana Gorges on February 17, 2014 and dismissed on March 4, 2014. The second of these earlier cases was the defense of an eviction action filed by Huntington in the 41-A District Court of Michigan, Case No. US14-00927-LT (the "Eviction Case"). Huntington claims that as of October 12, 2015, it had incurred reasonable attorney fees and expenses in the total amount of $177,621.51, in connection with the Hana Gorges Bankruptcy, the Eviction Case, and this bankruptcy case filed by Gorges, including fees for litigating the Sanctions Motion itself.[5] Huntington seeks an order sanctioning Sandweiss in this amount.

The Court permitted the parties to conduct discovery regarding the Sanctions Motion, and then entered a final pretrial order.[6] The Court held an evidentiary hearing, and then took the matter under advisement.

The Court has carefully reviewed the evidence presented in the evidentiary hearing, and the written and oral arguments of counsel for the parties. The evidence includes the testimony of the witnesses and the exhibits that were admitted into evidence. The witnesses who testified are Hana Gorges, Maurice Gorges, Christ Gorges, Stuart Sandweiss, and John Schandevel. The exhibits that were admitted into evidence are Huntington Exhibits 7, 8, 21, 28, 31, 34-40, 42-44; and Sandweiss Exhibits A-E and all their subparts (except D.ii, which was not admitted into evidence).

This Opinion and the Order to follow will constitute the Court's decision on the Sanctions Motion. This Opinion states the Court's findings of fact and conclusions of law.

---

[5] *See* Huntington Ex. 31 (supplement including affidavit of attorney Marc P. Jerabek).

[6] Joint Final Pretrial Order (Docket # 119).

For the reasons stated in this Opinion, the Court will deny Huntington's Sanctions Motion, and decline to sanction either Sandweiss or the Sandweiss Firm.

## II. Jurisdiction

This Court has subject matter jurisdiction over this contested matter under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a) (E.D. Mich.). This is a core proceeding, under 28 U.S.C. §§ 157(b)(2)(A) and 157(b)(2)(O).

In addition, this adversary proceeding falls within the definition of a proceeding "arising under title 11" and of a proceeding "arising in" a case under title 11, within the meaning of 28 U.S.C. § 1334(b). Matters falling within either of these categories in § 1334(b) are deemed to be core proceedings. *See Allard v. Coenen (In re Trans-Industries, Inc.*), 419 B.R. 21, 27 (Bankr. E.D. Mich. 2009). This is a proceeding "arising under title 11" because it is "created or determined by a statutory provision of title 11," *see id.*, including Bankruptcy Code § 105(a). And this is a proceeding "arising in" a case under title 11, because it is a proceeding that "by [its] very nature, could arise only in bankruptcy cases." *See Allard v. Coenen*, 419 B.R. at 27.

## III. Discussion

### A. Background and facts

### 1. Stipulated facts

Initially, the Court incorporates and adopts, as part of its findings of fact, the many facts stipulated to by the parties in the final pretrial order (the "Stipulated Facts"). The Court makes other findings later in this Opinion. The Stipulated Facts, as stated in the Final Pretrial Order, are the following:

4. Stipulation of Facts:

4

a. On November 15, 2012, Maurice and Hana Gorges filed their chapter 7 bankruptcy petition, Case No. 12-65140 (the "Chapter 7").

b. On December 26, 2012, Huntington was granted relief from the automatic stay in the Chapter 7, allowing it to proceed with its foreclosure of the mortgage on the Real Property.

c. On February 20, 2013, Maurice and Hana Gorges received a joint discharge in the Chapter 7.

d. On February 17, 2014, Hana Gorges filed the Hana Gorges Bankruptcy.

e. Hana Gorges did not file the required documents to maintain the Hana Gorges Bankruptcy and it was dismissed on March 4, 2014.

f. On February 21, 2014, Huntington filed a Summary Proceeding (the "Eviction Case") against Maurice and Hana Gorges in the 41-A District Court of Michigan (the "Eviction Court"), Case No. US14-00927-LT.

g. On April 2, 2014, Maurice and Hana Gorges were ordered to pay $1,866.66 within seven days and then $2,000 per month beginning on May 1, 2014 (the "Escrow Order"), until further ordered by the Eviction Court.

h. Maurice and Hana Gorges did not make any payments under the Escrow Order.

i. Huntington subsequently sought relief in the Eviction Court for Maurice and Hana Gorges' failure to make the escrow payments.

j. On September 11, 2014 the 41A District Court issued an Order (the "September 11 Order"):

   i. Granting Huntington's Motion for Summary Disposition as to all issues related to Defendant's bankruptcy claim and all issues related to the procedural aspects of the foreclosure proceedings for the reasons stated on the record.

5

ii. Waiving Defendants' right to a jury trial due to their failure to pay the amount set forth in the Escrow Order.

iii. Finding that Defendants satisfied their requirements to answer the complaint but that they may file a written Answer within 21 days.

iv. Finding that there are questions of fact present as to the parties' settlement negotiations and the implications on the foreclosure proceedings.

v. Allowing discovery and motions until the trial date.

k. On October 2, 2014 Huntington Bank filed a Motion for Reconsideration of the September 11 Order in the Eviction Court.

l. On October 24, 2014 the Eviction Court denied Huntington Bank's Motion for Reconsideration.

m. On October 31, 2014 Maurice and Hana Gorges filed a Motion to Compel discovery in the 41A District Court.

n. On November 19, 2014 the Eviction Court heard the Motion to Compel and Huntington's Motion to Compel Production of Documents, Depositions, and Property Inspection, at which time the Eviction Court ruled that:

i. The parties shall exchange interrogatory responses and documents by November 25, 2014 except that Defendants shall provide documents to Huntington's counsel on November 21;

ii. Huntington's representative shall appear for video deposition on November 21, 2014;

iii. Defendants and Christ Gorges shall appear for depositions on November 26, 2014;

iv. Trial was adjourned to December 10, 2014;

v. If Krystal Gorges is to testify, Huntington may depose her prior to trial;

6

vi. Huntington's request to inspect the property was denied but may be reconsidered if Huntington receives judgment in its favor.

o. On December 10, 2014, the day scheduled for trial in the Eviction Action, Huntington and the Gorges Family entered into a settlement (the "Settlement").

p. The Settlement, among other terms, required Maurice and Hana Gorges to tender $20,000 to Huntington before December 17, 2014 at 5:00 p.m., with the balance to be paid before February 9, 2015. In the event that either payment was not made, Huntington's counsel could release a consent judgment, from escrow, and have it entered with the Eviction Court.

q. The Gorges Family did not make either payment required under the Settlement.

r. On December 17, 2014, Maurice Gorges filed the Maurice Gorges Bankruptcy.

s. Following the hearing of Huntington's Motion for Relief from Stay held on January 15, 2015, this Court issued its Order Granting in Part, and Denying in Part, Motion by Huntington National Bank for Relief from Stay (Docket No. 31, "Order on Motion").

t. In part, the Order on Motion provided Maurice and Hana Gorges until February 17, 2015 to tender the payments under the Settlement.

u. On February 18, 2015, Huntington filed its Affidavit of Non-Compliance (Docket No. 38) and this Court entered its Order Granting Relief from the Automatic Stay related to the Real Property (Docket No. 39).

v. On February 24, 2015, the Eviction Court entered the Consent Judgment for possession of the Real Property.

w. On March 4, 2015, Maurice Gorges filed his Motion for Voluntary Dismissal of Bankruptcy Case (Docket No. 42).

x. On March 4, 2015, this Court entered its Dismissal of the Maurice Gorges Bankruptcy (Docket No. 43).

7

y. On March 20, 2015, this Court entered its Opinion and Order Regarding Huntington's Motion to Set Aside Order Granting Debtor's Request for Voluntary Dismissal of Chapter 13 Case (Docket No. 53) which, among other things, required Maurice Gorges and Stuart Sandweiss, each, to file a response to Huntington's motion ("Motion to Set Aside Order").

z. Maurice Gorges did not file a response to Huntington's Motion to Set Aside Order and, on April 6, 2015, this Court entered its Order Granting Sanctions in Favor of Huntington Against Debtor Maurice Gorges (Docket No. 57).

aa. On May 1, 2015, this Court entered its Order Regarding Further Proceedings on Huntington's Request for Sanctions Against Debtor's Attorney, Stuart Sandweiss, Contained in Huntington's Motion to Set Aside Order, Etc. (Docket No. 62), which, among other things, scheduled this matter for an evidentiary hearing.[7]

## 2. The December 10, 2014 settlement agreement that resolved the Eviction Case

As noted above, the state court Eviction Case was settled by a written agreement (the "Settlement Agreement") signed on December 10, 2014.[8] The parties to the Settlement Agreement were Huntington, Maurice Gorges, Hana Gorges, and Christ Gorges (the son of Maurice and Hana Gorges). The Settlement Agreement was finalized and signed at the state court, on the day trial was scheduled to begin in the Eviction Case. The Settlement Agreement was signed by all of the parties and their attorneys, and was filed in the state court.

The Settlement Agreement required Gorges and his wife to pay Huntington a total of $410,000.00, in two installments, in exchange for conveyance of the Real Property by

---

[7] Joint Final Pretrial Order (Docket # 119) at 9-11.

[8] A copy of the Settlement Agreement is Sandweiss Ex. B-16, page 2, and also is Huntington Ex. 21, page 2. This Settlement Agreement also appears in the record of this case, at Docket # 14 (Ex. 10, page 2); and at Docket # 46 (Ex. 9, page 2).

8

Huntington to Maurice and Hana Gorges. The first payment was "a non-refundable payment of $20,000.00" that had to be paid by 5:00 p.m. on December 17, 2014. The remaining $390,000.00 had to be paid by 5:00 p.m. on February 9, 2015. The Settlement Agreement provided that "[u]pon timely receipt of the full $410,000, Huntington will execute and deliver a quit claim deed or appropriate court order vesting title for the property to Maurice and Hana Gorges (Gorges' choice)." In the next sentence, the Settlement Agreement stated: "If Maurice and Hana want title in the name of someone else, they can make this transfer independent of our settlement."

The Settlement Agreement also required the Gorges parties to "execute a consent judgment for possession" of the Real Property, to be "held in escrow" by Huntington's counsel, and provided that if payment was not timely made, "the consent judgment may be immediately filed with the court along with an application for an order of eviction (no statutory 10 day waiting period)." The agreement also provided that "Huntington may also immediately tender the consent judgment if [the Gorges parties] fail to timely pay the $20,000 non-refundable payment." If full payment was timely made, the escrowed consent judgment would be destroyed and the Eviction Case dismissed with prejudice.

In the sentence of the Settlement Agreement quoted above, which contains the phrase "Huntington will execute and deliver a quit claim deed **or appropriate court order vesting title** for the property to Maurice and Hana Gorges **(Gorges' choice)**," (emphasis added), the words just bolded were added by hand. In a hearing in the state court on the day the agreement was signed, attorney Sandweiss explained why these words were added, giving the Maurice and Hana Gorges the choice of receiving a quit claim deed or a court order:

9

The agreement provides that my clients or their designees will pay the sum of $410,000 to acquire title to the property either through a Quitclaim Deed or a Court Order, and we have to work out the exact things, it's going to be my client's choice as to how they want to do it.

The concern is with the transfer taxes, and my experience is that if there is a Court Order we can avoid paying roughly three-and-one-half thousand dollars in transfer taxes.[9]

According to Huntington's appraisal, the Real Property had a value of over $500,000.[10] At this value, the Settlement Agreement's purchase price of $410,000 would enable Maurice and Hana Gorges to obtain significant equity if they purchased the Real Property, even with the approximately $13,500 in real estate taxes owing on the property at the time.[11] As Huntington's representative, John Schandevel, testified:

The house had an appraised value of over $500,000. So our agreement to the $410,000 at least in my opinion was still Huntington giving up almost $100,000 in value in order to get that deal done and you know, close the case and move on.[12]

The evidence is undisputed that when they made the Settlement Agreement and thereafter, Maurice and Hana Gorges had financial resources available to them to purchase the Real Property for $410,000. Importantly, Sandweiss had a good faith and reasonable belief of this, at all times on and after the date of the Settlement Agreement on December 10, 2014.[13] The

---

[9] Sandweiss Ex. B-17 (Tr. of December 10, 2014 Eviction Case hearing) at 6.

[10] Hearing Tr. (Docket #150) at 141 (Testimony of Maurice Gorges); Hearing Tr. (Docket # 151) at 99 (Testimony of John Sandevel).

[11] *E.g.*, Hearing Tr. (Docket # 150) at 125 (Testimony of Maurice Gorges).

[12] Hearing Tr. (Docket # 151) at 99.

[13] Hearing Tr. (Docket # 150) at 202-03, 228, 229, 230 (Testimony of Sandweiss).

funding available to Gorges at the time consisted of $200,000 that Krystal Gorges, the daughter

of Maurice and Hana Gorges, would pay, and which she had available in an account,[14] plus a loan

that had been approved in the amount of up to $250,000.[15] This total of up to $450,000 would

enable Gorges to pay Huntington the $410,000 purchase price under the Settlement Agreement,

and to pay the real estate taxes owing on the Real Property, then in the amount of about

$13,500.00.

The above information about these funding sources were disclosed to Sandweiss before

the parties made the Settlement Agreement. And Sandweiss testified, credibly and without

contradiction, that before the settlement was made he had seen proof that Krystal Gorges had the

$200,000 in an account, during discovery in the Eviction Case.[16]

**3. The request by Gorges that Huntington convey title to the Real Property in the name of Krystal Gorges, rather than in the names of Maurice and Hana Gorges**

About 28 hours before Maurice and Hana Gorges were due to make the $20,000 non-

refundable payment to Huntington under the Settlement Agreement (the due date being

December 17, 2014 at 5:00 p.m.), they requested that Huntington agree to convey title to the Real

Property in the name of Krystal Gorges, rather than in the names of Maurice and Hana Gorges as

provided in the Settlement Agreement. The reason for this request is unknown, and no reason

was communicated to Huntington. One can speculate that perhaps Gorges and his family wanted

---

[14] The $200,000 had originated with Christ Gorges, and he had transferred it into Krystal Gorges's account. (Hearing Tr. (Docket # 150) at 167 (Testimony of Christ Gorges)).

[15] *See* Hearing Tr. (Docket # 150) at 126-27, 148, 151, 152-53 (Testimony of Maurice Gorges); *see also* Hearing Tr. (Docket # 150) at 98-99 (Testimony of Hana Gorges).

[16] Hearing Tr. (Docket # 150) at 229 (Testimony of Sandweiss).

11

title in the name of Krystal Gorges because she was to provide $200,000 of the funding to purchase the Real Property. And one can speculate that perhaps Gorges and his family wanted Huntington to convey title to Krystal Gorges directly, rather than have title conveyed to Maurice and Hana Gorges and then have them reconvey the property to Krystal Gorges, in order to avoid having to pay a transfer tax on a second conveyance, from Maurice and Hana to Krystal. But on the present record these things would only be speculation. No evidence was presented to explain why Gorges asked that Huntington convey title directly to Krystal Gorges, and there is no evidence that Gorges ever disclosed any such reason to Huntington.

In any event, at 12:31 p.m. on December 16, 2014, Sandweiss sent the following e-mail message to Huntington's attorney:

> Marc,
>
> The Gorges family contacted me today about having the title vest in Krystal's name (as originally contemplated) as opposed to Maurice and Hana. In other words, the Quit Claim Deed would be from the bank to Krystal. Does you[r] client have any objection?
>
> Please let me know ASAP.
>
> Thank you,
>
> Stuart Sandweiss[17]

Four minutes later, Huntington's attorney responded, by e-mail, refusing this request:

> This issue is specifically addressed in the consent order as something that Maurice and Hana will have to do independent of our settlement. I'm not trying to be difficult here, but the settlement is a re-purchase and Krystal was not the prior owner.[18]

---

[17] Huntington Ex. 44.

[18] *Id.*

Seven minutes after that, Sandweiss sent this e-mail to Huntington's attorney, repeating

the Gorges's request, in different words:

> I understand what the settlement agreement states. Mr. and Mrs.
> Gorges want to assign their right to repurchase the property to
> Krystal. The question is whether or not your client is going to
> object. Alternatively, will your client agree to an LLC purchasing
> the property?
>
> Please contact your client and let me know.
>
> Stuart
>
> P.S. If necessary I will be happy to discuss this with you and
> explain the circumstances.[19]

Only 35 minutes later, at 1:17 p.m. on December 16, 2014, Huntington's counsel sent the

following reply, again refusing the Gorges's request:

> I confirmed that my client is not interested in changing any of the
> terms of our settlement.[20]

Later that day, Christ Gorges, the brother of Krystal Gorges and son of Maurice and Hana

Gorges, called Huntington's attorney to again request that title be in the name of Krystal Gorges.

Huntington's attorney then stated the following in an e-mail to Sandweiss, sent at 11:29 a.m. on

December 17, 2014, again refusing the Gorges' request:

> Stuart,
>
> After I sent you the below email yesterday, I received a call from
> Christ. He was again asking for the settlement to be modified. I
> again passed the request on to Huntington. Huntington confirmed
> this morning that it is not interested in modifying the settlement.

---

[19] *Id.*

[20] *Id.*

13

Christ asked that I call his cell phone to let him know what I heard. However, since you are representing him, I trust that you will pass this along. If you would like me to call him direct, please let me know.

Thank you,

Marc [21]

In repeatedly refusing the Gorges's request that title to the Real Property be placed in the name of Krystal Gorge, rather than Maurice and Hana Gorges, Huntington did not give a reason, other than to say that this was not what the Settlement Agreement provided. Huntington merely stated repeatedly that it was not interested in modifying the settlement. When asked in the evidentiary hearing why Huntington had refused the Gorges's request, Huntington's representative who made the decision, John Schandevel, answered this way:

> It was specifically put into the settlement that the title would go back to Maurice and Hana Gorges. It was just agreed to. Given the -- the nature of our experience through the process and the potential that we didn't know what the purpose was, or what the ramifications might be of putting the title into someone else's name, we chose not to accept that.[22]

Thus, it appears that Huntington's refusal was because of some vague fear of the unknown, a fear that was not communicated to or discussed with any member of the Gorges family or the Gorges's attorney, Sandweiss.

As of the afternoon of December 14, 2014, therefore, the situation was this: (1) Gorges and his family had a deadline of 5:00 p.m. that day to make the non-refundable payment of

---

[21] *Id.*; *see also* Hearing Tr. (Docket # 150) at 203-04 (Testimony of Sandweiss about the e-mails).

[22] Hearing Tr. (Docket # 151) at 62.

14

$20,000 to Huntington, toward purchase of the Real Property under the Settlement Agreement, or Huntington would obtain a consent judgment of possession; (2) Maurice Gorges had the $20,000 available to make the payment that day, through his daughter Krystal having the money on hand in her account;[23] (3) for reasons unknown and not communicated to Huntington, Maurice and Hana Gorges wanted Huntington to agree to convey title to the Real Property in the name of Krystal Gorges, rather than in the names of Maurice and Hana Gorges; and (4) for reasons unknown and not communicated to Gorges, Huntington was unwilling to agree to the Gorges's request.

### 4. The filing of Gorges's Chapter 13 bankruptcy case on December 17, 2014

Sandweiss contends, and testified, that the Gorges's request that Huntington convey the Real Property in the name of Krystal Gorges was not a request to modify the Settlement Agreement.[24] Huntington has consistently disagreed with this contention. At first blush, at least, Sandweiss would seem clearly to be wrong. As quoted in Part III.A.2 of this Opinion, the Settlement Agreement says that upon timely payment of the full $410,000 purchase price, "Huntington will execute and deliver a quit claim deed or appropriate court order vesting title for the property to Maurice and Hana Gorges (Gorges' choice)." Then, in the very next sentence, the agreement stated: "If Maurice and Hana want title in the name of someone else, they can make this transfer independent of our settlement."[25]

---

[23] Hearing Tr. (Docket # 150) at 152-53 (Testimony of Maurice Gorges); 181 (Testimony of Christ Gorges).

[24] Hearing Tr. (Docket # 150) at 236 (Testimony of Sandweiss).

[25] Sandweiss Ex. B-16 at page 2.

This language clearly means that the transfer of the Real Property to anyone other than Maurice and Hana Gorges would have to be done by Maurice and Hana, by separate transfer after Huntington had transferred the property to Maurice and Hana.

In his testimony, Sandweiss contended that the reference in this Settlement Agreement language to "(Gorges' choice)" means that Maurice and Hana Gorges had a choice as to who Huntington conveyed the Real Property to.[26] But this is not correct, as discussed in Part III.A.2 of this Opinion. As this language unambiguously means, and as made clear by Sandweiss himself on the record during the December 10, 2014 state court hearing, this language only gave Maurice and Hana Gorges a choice between receiving a quit claim deed to them for the Real Property or receiving a "court order vesting title" in Maurice and Hana Gorges.

Huntington therefore was not unreasonable in taking the view that it would require an agreed modification of the Settlement Agreement in order for Huntington to convey the Real Property to Krystal Gorges, as Maurice and Hana Gorges requested. But the Court finds that neither was it unreasonable or frivolous for Sandweiss to disagree with Huntington's position.

This is so based on a somewhat different theory, which Sandweiss testified about, and which Sandweiss alluded to in one of his pre-bankruptcy e-mails to Huntington's attorney. That theory is that Maurice and Hana Gorges had a right to *assign* their rights under the Settlement Agreement to Krystal Gorges, and that such assignment would permit and require Huntington to convey the Real Property directly to Krystal Gorges. In one of his December 16, 2014 e-mails to Huntington's attorney, Sandweiss alluded to Maurice and Hana Gorges assigning their rights under the Settlement Agreement to Krystal Gorges, as a basis for Huntington to convey title to

---

[26] Hearing Tr. (Docket # 150) at 253 (Testimony of Sandweiss).

Krystal Gorges.[27]  And during the evidentiary hearing, Sandweiss testified this way, under cross-

examination by Huntington's counsel:

> Q . . . What language in there does it – where does it specifically
> say that Huntington was obligated to deed the property to Krystal?
>
> A  It says if Maurice and Hana want title in the name of someone
> else, they can make this transfer independent of our settlement.
>
> Q  So outside of the settlement agreement in other words?
>
> A  Not necessarily. That's the way you interpret it. . . . I said that's
> what I said.  There's definitely – I can definitely see where there
> could be room for ambiguity, but I think that it gives them the right
> to say hey, we're going to assign our right to somebody else.  And I
> think even – I don't even think it needs to be part necessarily of the
> settlement agreement. I think under general contract law the party
> to a contract has the right to assign a part of a contract to another
> party, unless it's got a personal contract for services or something
> like that.  I think that's contracts 101.  But I – there was no time
> from when I learned of this until such time as we had – we had a
> four hour window there roughly to get this determined and didn't
> want to take a chance on being wrong.[28]

    This assignment theory by Sandweiss, as a basis for his argument that an amendment of

the Settlement Agreement was not required in order for Huntington to convey title directly to

Krystal Gorges, was not unreasonable or frivolous.  Rather, it was a reasonable, colorable theory,

and Sandweiss asserted this theory in good faith.  For example, it appears that under Michigan

law, a purchaser under a real estate contract has the right to assign his rights under that contract

to a third party, without the consent of the seller.  *See Hull v. Hostettler*, 194 N.W. 996, 997

---

[27]  Huntington Ex. 44 at pages 1-2 (December 16, 2014, 12:42 p.m. e-mail from Sandweiss to
Jerabek) ("I understand what the settlement agreement states.  Mr. and Mrs. Gorges want to assign their
right to repurchase the property to Krystal.  The question is whether or not your client is going to
object.")

[28]  Hearing Tr. (Docket # 150) at 253-54 (Testimony of Sandweiss).

(Mich. 1923) (holding that an anti-assignment clause in a real estate contract "does not absolutely prohibit the vendee from selling and assigning his interest in the property" because "[i]f it did, it would be an unlawful restriction upon the power to alienate real estate" and holding that despite this clause, the vendees "had a right to sell and assign their interest"); 1 Mich. Civ. Jur. Assignments § 20 (August 2018 Update) (Rights and incidents passing by assignment) ("The assignment of property or of a contract right transfers ownership of the property or right owned by the assignor."); *see also* Arthur L. Corbin, Corbin on Contracts § 870 at 817 (1 vol. ed. 1952) (Effect of Obligor's Assent to an Assignment) ("The effectiveness of an assignment does not depend upon the assent of the obligor.").

Gorges decided to file his Chapter 13 bankruptcy case on December 17, 2014, just before the 5:00 p.m. deadline that day to make the $20,000 non-refundable payment to Huntington. He did this not because he did not have the $20,000 available to make the payment, and not because he never intended to make any payments to Huntington and just wanted to gain more time before losing possession of the Real Property to Huntington. Rather, the Court finds that Gorges filed this bankruptcy case only for the purpose of getting some additional time to try to find a resolution to the title issue, before he had to pay the non-refundable $20,000.[29] And this was Sandweiss's understanding and purpose when he filed this Chapter 13 case for Gorges. As Sandweiss testified:

> Q . . . You filed Chapter 13 for Maurice in December 2014, is that correct?
>
> A I believe December 17th, yes.

---

[29] Hearing Tr. (Docket # 150) at 163, 181 (Testimony of Christ Gorges).

Q . . .  And the purpose, although I think it's been identified by you, by Mr. -- by both Christ and -- and Maurice, one of the prime reasons was that Maurice needed the ability –- Maurice and Hana to come up with that $20,000 down stroke?

A  That was one of the prime -– and I don't know if the word is come up with it to pay it. They wanted to -- there was this issue with the title and they wanted to make sure before the money was paid that they would be able to resolve this issue.  I didn't even quite understand the entire issue, but whatever it was, they said they were taking care of it.   And they came -- Maurice and Christ came to me after the email from Mr. Jerabek, I think that was at -- and it was lunch time on the 17th and said, okay, they don't want to change the – they don't want to deal this, what are our options. And I said well, you can go back to District Court and try and get resolution there.  I said, but remember you're on a tight timetable and you only got a couple hours.  I said you can move out and give up the right to -- you know, if you don't want to -- don't want to do the deal, then just move out.  I said, or, if you want the -- the 60 day exemption by 108(b) then you can file Chapter 13 and then . . . under 108(b) you've got 60 days to cure the $20,000 payment and work out whatever it is with the tax issues and work out whatever title issues there are.  And you've got that ability to do that.  So that's what they ultimately chose.

Q  . . .  And again that's after the bankruptcy proceeding itself is filed?

A  No, that was before. I had this discussion with them before – . . . that afternoon. . . . [A]nd so they decided that Maurice was going to file bankruptcy.[30]

Under Bankruptcy Code § 108(b),[31] the filing by Gorges of this Chapter 13 case, at 4:21

---

[30]  Hearing Tr. (Docket # 150) at 231-32 (Testimony of Sandweiss).

[31]  Section 108(b) states:

(b) Except as provided in subsection (a) of this section, if applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor or an individual protected under section 1201 or 1301 of this title may file any pleading, demand, notice, or proof of claim or loss, cure a default, or perform any other similar act, and such period has not expired before the date of the

19

p.m. on December 17, 2014, had the effect of giving Gorges an additional 60 days after the bankruptcy petition date — *i.e.*, until Monday, February 17, 2015[32] — to make the payments that had been due at 5:00 p.m. on December 17, 2014 ($20,000) and on February 9, 2015 ($390,000). *See also* discussion of § 108(b) in Part III.A.5 of this Opinion, below.

Huntington's theory is that Sandweiss filed the bankruptcy petition for Gorges *only* to delay the time when Huntington would be able to obtain possession of the Real Property, and that Sandweiss knew or had reason to know that Gorges had no intention of making any payment required by the Settlement Agreement. But Huntington failed to prove this theory. Rather, the Court finds from the evidence that Sandweiss filed this bankruptcy case for Gorges only to obtain more time to try to resolve the dispute with Huntington, over Huntington's refusal to convey the property directly to Krystal Gorges, and in the reasonable hope that the issue could be resolved, that the $410,000 payment would be made to Huntington before the extended deadline under § 108(b) expired, and that the Gorges family would be able to keep and stay in their home, under the Settlement Agreement.

**5. Events after Gorges filed this Chapter 13 case**

On December 23, 2014, less than a week after Gorges filed this bankruptcy case,

---

> filing of the petition, the trustee may only file, cure, or perform, as the case may be, before the later of—
>
> (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
>
> (2) 60 days after the order for relief.

11 U.S.C. § 108(b).

[32] Day 60 fell on Sunday, February 15, 2015, and the next day was a legal holiday (President's Day), so the 60-day period ended on Tuesday, February 17, 2015. *See* Fed. R. Bankr. P. 9006(a)(1).

Huntington filed a motion seeking to modify the automatic stay, or in the alternative to dismiss this case.[33] Huntington's motion argued that Gorges filed this case "in bad faith, and for the sole purpose of delaying a pending eviction."[34] Gorges filed a response, through Sandweiss, objecting to the motion.[35] The Court held an expedited hearing on the motion, on January 15, 2015.

During the hearing, Huntington argued, among other things, that Bankruptcy Code § 108(b) did not extend the Gorges's payment deadlines under the Settlement Agreement.[36] Among other things, Sandweiss argued, on behalf of Gorges, that: (1) § 108(b) did extend the Gorges's deadlines for making the two payments under the Settlement Agreement, to February 17, 2015; and (2) Gorges did not file this bankruptcy case to delay an eviction, but rather in a good faith effort to use § 108(b) to obtain more time to try to resolve the title issue with Huntington, so that the purchase could go forward; and (3) if the $410,000 purchase price was not paid to Huntington by the February 17, 2015 deadline, the Court *should* grant stay relief to permit Huntington to pursue eviction in state court.[37]

At the conclusion of the motion hearing, the Court ruled from the bench that § 108(b) did indeed apply, and that it had the effect of extending until February 17, 2015 the Gorges's deadlines to make the required payments under the Settlement Agreement.[38] The Court declined

---

[33] Docket # 14.

[34] *Id.* at 1.

[35] Docket # 23.

[36] Hearing Tr. (Docket # 35) at 7-8.

[37] *Id.* at 11-12, 13-18, 21-22.

[38] *Id.* at 31.

21

to dismiss this case, but the Court ruled that stay relief would be granted if Gorges did not pay Huntington the full $410,000 purchase price by the February 17, 2015 deadline.[39]

During its bench ruling, the Court also ruled that even *if* Gorges filed this bankruptcy case *only* in order to obtain more time to make the $20,000 non-refundable payment under the Settlement Agreement, that would not constitute "any sort of improper scheme to hinder, delay, or defraud Huntington." This is so, the Court reasoned, because this "is an instance of a debtor taking advantage of a provision of federal law and availing himself of a right that he has to file bankruptcy and take advantage of the federal law under Section 108(b)." And, the Court further reasoned, "there is nothing in the [S]ettlement [A]greement that precluded [Gorges] from doing so or that . . . indicates that his having done that . . . would have been impermissible or improper or fraudulent in any way."[40]

The Court entered an order on January 16, 2015, granting Huntington's stay relief motion in part. The Order gave Gorges through February 17, 2015 to pay Huntington the $410,000 purchase price under the Settlement Agreement, and provided that Huntington could get an order granting relief from stay, to pursue possession of the Real Property in state court, including eviction, if the payment was not timely made.[41]

After filing this bankruptcy case, neither Sandweiss nor any of the Gorges family made any further requests that Huntington transfer the Real Property to Krystal Gorges, rather than to

---

[39] *Id.* at 32-33.

[40] *Id.* at 33-34.

[41] "Order Granting in Part, and Denying in Part, Motion by Huntington National Bank for Relief from Stay" (Docket # 31).

Maurice and Hana Gorges.[42] The evidence does not disclose why this is. But given Huntington's arguments in its stay-relief/dismissal motion, and the position Huntington took during the hearing on that motion, it clearly appears that any post-petition efforts by Sandweiss to discuss the title issue with Huntington would have been futile. And Sandweiss certainly would have been reasonable to think so.

Ultimately, Maurice and Hana Gorges decided not to make the payments due under the Settlement Agreement, and to forfeit their right to purchase the Real Property under the Settlement Agreement. Until they made this decision, they had intended to go forward with the purchase of the Real Property.[43] They made the decision to give up the Real Property in February 2015, and they moved out of the property on or about February 16 or 17, 2015.[44] They made this decision, they say, only because the title issue was not resolved.[45] Sandweiss did not learn of this decision until on or shortly after February 9, 2015.[46]

On February 18, 2015, Huntington filed an affidavit stating that Gorges had not paid the $410,000 purchase price under the Settlement Agreement, and the same day, the Court entered an order lifting the automatic stay, effective immediately, to permit Huntington to pursue its rights

---

[42] *See* Hearing Tr. (Docket # 150) at 205, lines 9-12 (Testimony of Sandweiss), 272-73 (Testimony of John Schandevel).

[43] *Id.* at 176, 180.

[44] Hearing Tr. (Docket # 150) at 175 (Testimony of Christ Gorges).

[45] Hearing Tr. (Docket # 150) at 123, 138, 142, 147 (Testimony of Maurice Gorges).

[46] Hearing Tr. (Docket # 150) at 230, 232-33 (Testimony of Sandweiss); Sandweiss Ex. C at pages 200-04 (February 9, 2015 e-mails between Stuart Sandweiss and Christ Gorges).

23

in state court to obtain possession of the Real Property, including through an eviction.[47] Huntington recovered actual possession of the Real Property on February 27, 2015.[48]

On March 4, 2015, Gorges, through Sandweiss, filed a motion to voluntarily dismiss this bankruptcy case, and the Court entered an order dismissing this case.[49] Huntington then filed its Sanctions Motion.

Part of its motion for sanctions sought a judgment against Gorges, for extensive physical damage that Gorges and others allegedly did to the Real Property before they moved out. The color photographs attached as exhibits to Huntington's Motion show outrageous damage to the home, which obviously was done deliberately by someone.[50] At a preliminary hearing on Huntington's Motion, Huntington's attorney alleged that Gorges and his family had done about $250,000 worth of damage to the Real Property before moving out.[51] But Huntington's attorney also made clear that Huntington was not seeking any monetary or other relief against Sandweiss for such damages. Nor does Huntington contend that Sandweiss in any way participated in damaging the Real Property, or that Sandweiss had any reason to know that such damage would occur. Rather, Huntington seeks only the excess attorney fees and related expenses that it says

---

[47] Docket ## 38, 39.

[48] Docket # 46 at 2, ¶ 8.

[49] Docket ## 42, 43.

[50] Docket # 46, *compare* Ex. 10 (before-damage photographs) *with* Ex. 14 (after-damage photographs). The Huntington motion, with black and white copies of the photographs attached, was admitted into evidence as Sandweiss Ex. E-14.

[51] Hearing Tr. (Docket # 153) at 5-6.

24

Sandweiss has caused Huntington to incur.[52]  As to Gorges himself, Huntington obtained a

judgment by default on April 6, 2015, in the amount of $78,000.00.[53]

## B.  Applicable law

### 1.  Sanctions under 28 U.S.C. § 1927

Under 28 U.S.C. § 1927,

> Any attorney or other person admitted to conduct cases in any court
> of the United States or any Territory thereof who so multiplies the
> proceedings in any case unreasonably and vexatiously may be
> required by the court to satisfy personally the excess costs,
> expenses, and attorneys' fees reasonably incurred because of such
> conduct.

28 U.S.C. § 1927.

The United States Court of Appeals for the Sixth Circuit has held that § 1927 permits

sanctions against individual attorneys only; it "does not authorize the imposition of sanctions on

a represented party, nor does it authorize the imposition of sanctions on a law firm.  *Claiborne v.*

*Wisdom*, 414 F.3d 715, 722–24 (7th Cir. 2005), *cert. dismissed*, 546 U.S. 116 (2006)."  *Rentz v.*

*Dynasty Apparel Indus., Inc.*, 556 F.3d 389, 396 n.6 (6th Cir. 2009).

This Court discussed § 1927 at length in *In re Sharkey*, 563 B.R. 655 (Bankr. E.D. Mich.

2017), and reiterates that discussion here:

> The United States Court of Appeals for the Sixth Circuit recently
> confirmed that bankruptcy courts have authority to order relief
> under § 1927.  *See Grossman v. Wehrle* (*In re Royal Mgt., Inc.*),
> 652 Fed. App'x 330, 341-42 (6th Cir. 2016), *cert. denied sub nom.*
> *Grossman v. Wehrle*, No. 16-642, 2017 WL 276189 (January 23,
> 2017).  And the Sixth Circuit recently discussed § 1927 as follows:

---

[52] *Id.* at 7-8.

[53] Docket # 57.

> "Section 1927 sanctions are warranted when an attorney *objectively* 'falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party.'" *Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642, 646 (6th Cir. 2006) (quoting *In re Ruben*, 825 F.2d 977, 984 (6th Cir. 1987)) (emphasis added). "Section 1927 sanctions may be imposed without a finding that the lawyer subjectively knew that his conduct was inappropriate." *Hogan v. Jacobson*, 823 F.3d 872, 886 (6th Cir. 2016). Thus, sanctions under 28 U.S.C. § 1927 "require a showing of something less than subjective bad faith, but something more than negligence or incompetence." *Rentz v. Dynasty Apparel Indus., Inc.,* 556 F.3d 389, 396 (6th Cir. 2009); *Red Carpet Studios*, 465 F.3d at 646; *In re Ruben*, 825 F.2d at 984.

*Knopf v. Elite Moving Systems*, No. 16-1307, 2017 WL 360555, at *4 (6th Cir. January 25, 2017) (footnote omitted).

Finally, in a recent case, the Bankruptcy Appellate Panel for the Sixth Circuit reviewed the case law and extensively described the standards applicable in the Sixth Circuit under § 1927:

> "The purpose of sanctions under § 1927 is "'to deter dilatory litigation practices and to punish aggressive tactics that far exceed zealous advocacy.'" *In re Royal Manor Mgmt., Inc.*, 525 B.R. 338, 365–66 (6th Cir. BAP 2015) (quoting *Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642, 646 (6th Cir. 2006) (citing *Jones v. Continental Corp.*, 789 F.2d 1225, 1230–31 (6th Cir. 1986))), *aff'd sub nom. Grossman v. Wehrle* (*In re Royal Manor Mgmt., Inc.*), 652 Fed.Appx. 330 (6th Cir. June 2016).
>
> > Sanctions are warranted under § 1927 if counsel "falls short of the obligations owed by a member of the

26

bar to the court and which, as a result, causes additional expense to the opposing party." *Rentz v. Dynasty Apparel Indus., Inc.*, 556 F.3d 389, 396 (6th Cir. 2009) (citation omitted). Sanctions require ''**more than negligence or incompetence**'' but "something less than subjective bad faith." *Hall v. Liberty Life Assurance Co. of Boston*, 595 F.3d 270, 276 (6th Cir. 2010) (citation omitted) . . . "**Discrete acts of vexatious conduct should be identified** and a determination made whether they were done in bad faith or, even if bad faith was not present, whether they multiplied the proceedings pursuant to 28 U.S.C. § 1927." *Riddle v. Egensperger*, 266 F.3d 542, 556 (6th Cir. 2001) (quoting *In re Ruben*, 825 F.2d 977, 990 (6th Cir.1987)).

*Royal Manor*, 525 B.R. at 365 (emphasis added). In *Royal Manor*, the Bankruptcy Appellate Panel explained the Sixth Circuit's standards:

Litigation conduct is reviewed "for 'unreasonable and vexatious' multiplication of litigation despite the absence of any conscious impropriety." *Jones*, 789 F.2d at 1230. Absent a showing of bad faith, sanctions may be imposed "at least when an attorney knows or reasonably should know that a claim pursued is frivolous, or that his or her litigation tactics will needlessly obstruct the litigation of nonfrivolous claims." [*Ridder v. City of Springfield*, 109 F.3d 288, 298 (6th Cir. 1997)], *quoting Jones*, 789 F.2d at 1230. "[T]he mere finding that an

27

attorney failed to undertake a
reasonable inquiry into the basis for a
claim does not automatically imply
that the proceedings were
intentionally or unreasonably
multiplied." *Ridder*, 109 F.3d at 298.
"An attorney is liable under § 1927
solely for excessive costs resulting
from the violative conduct." *Id*. at
299. **Simple inadvertence or
negligence that frustrates the trial
judge will not support a sanction
under § 1927**. *In re Ruben*, 825 F.2d
at 984. "There must be some conduct
on the part of the subject attorney
that trial judges, applying the
collective wisdom of their
experience on the bench, could agree
falls short of the obligations owed by
a member of the bar to the court and
which, as a result, causes additional
expense to the opposing party." *Id*.
"A sanction is generally improper
where a successful motion could
have avoided any additional legal
expenses by defendants." *Id*. at 988.

*Royal Manor*, 525 B.R. at 365 (quoting *Riddle v.
Egensperger*, 266 F.3d at 553) (emphasis added). In
summary, § 1927 is implicated when a party has (1)
multiplied proceedings, (2) unreasonably and
vexatiously, (3) in bad faith or when an attorney
knows or reasonably should know that the claim or
litigation tactics pursued is frivolous or will impede
the litigation of proper claims, and (4) which has
resulted in additional expense to the other parties.
. . .

The Sixth Circuit has provided a helpful
perspective on the distinction between "zealous
representation" and "vexatious conduct:"

An attorney's ethical obligation of

28

> zealous advocacy on behalf of his or
> her client does not amount to *carte
> blanche* to burden the federal courts
> by pursuing claims that are frivolous
> on the merits, or by pursuing
> nonfrivolous claims through the use
> of multiplicative litigation tactics
> that are harassing, dilatory, or
> otherwise "unreasonable and
> vexatious." Accordingly, at least
> when an attorney knows or
> reasonably should know that a claim
> pursued is frivolous, or that his or
> her litigation tactics will needlessly
> obstruct the litigation of nonfrivolous
> claims, a trial court does not err by
> assessing fees attributable to such
> actions against the attorney.

> *Jones v. Continental Corp.*, 789 F.2d 1225, 1230
> (6th Cir. 1986) "*Jones* makes clear that the standard
> for section 1927 determinations in this circuit is an
> objective one, entirely different from determinations
> under the bad faith rule." *Rogers v. Salvation Army*,
> No. 14–12656, 2015 WL 4488512, at *3 (E.D.
> Mich. July 23, 2015).

> To award fees and costs pursuant to § 1927,
> the court must find that the attorney not only
> multiplied the proceeding, but that the attorney did
> so in objective bad faith or knew or should have
> known the actions were frivolous. Mere
> incompetence or negligence does not justify § 1927
> sanctions.

> *Montedonico v. Blasingame* (*In re Blasingame*), 559 B.R. 676,
> 686-89 (B.A.P. 6th Cir. 2016) (footnote omitted).

563 B.R. at 670-72.

## 2. Sanctions Under Federal Rule of Bankruptcy Procedure 9011

Fed. R. Bankr. P. 9011 provides, in relevant part:

(b) Representations to the court

By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—

> (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

(c) Sanctions

If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.

> (1) How initiated

> (A) By motion

> A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b). It shall be served as provided in Rule 7004. The motion for sanctions may not be filed with or presented to the court

unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected, except that this limitation shall not apply if the conduct alleged is the filing of a petition in violation of subdivision (b). If warranted, the court may award to the party prevailing on the motion the reasonable expenses and attorney's fees incurred in presenting or opposing the motion. Absent exceptional circumstances, a law firm shall be held jointly responsible for violations committed by its partners, associates, and employees.

(B) On court's initiative

On its own initiative, the court may enter an order describing the specific conduct that appears to violate subdivision (b) and directing an attorney, law firm, or party to show cause why it has not violated subdivision (b) with respect thereto.

Fed. R. Bankr. P. 9011.

"'[T]he test for imposing Rule 9011 sanctions is whether the individual's conduct was reasonable under the circumstances' at the time of the conduct, without the use of hindsight. *Mapother & Mapother, P.S.C. v. Cooper* (*In re Downs* ) 103 F.3d 472, 481 (6th Cir.1996)." *In re Opra*, 365 B.R. 728, 741 (Bankr. E.D. Mich. 2007).

The Court may impose Rule 9011 sanctions on its own initiative, under the procedure described in Rule 9011(c)(1)(B), quoted above. The Court has not taken such initiative in this case. Rather, the issue of Rule 9011 sanctions is before the Court only on Huntington's Motion.

Huntington did not comply with the 21-day safe harbor provision of Rule 9011(c)(1)(A), quoted above. Under that rule, the safe harbor provision does not apply to Sandweiss's conduct in filing Gorges's bankruptcy petition, but it does apply to any other conduct by Sandweiss

31

alleged to have violated Rule 9011(b). And to the extent the 21-day safe harbor provision does

apply, the Court cannot grant Rule 9011 sanctions on a party's motion unless the party has

complied with the safe harbor provision. *See In re Blasingame*, 709 F. App'x 363, 369–70 (6th

Cir. 2018) (holding that "the bankruptcy court abused its discretion by granting [a party's]

motion for sanctions under Rule 9011 where [the party seeking sanctions] failed to comply with

the safe harbor provision") (citing "*Penn, LLC v. Prosper Bus. Dev. Corp.*, 773 F.3d 764, 767

(6th Cir. 2014) (holding that parties' failure to comply with the safe harbor provision of Rule

9011's counterpart in the civil context, Rule 11 of the Federal Rules of Civil Procedure, will

result in a denial of a motion for sanctions)" and *"Ridder v. City of Springfield*, 109 F.3d 288,

296 (6th Cir. 1997) (same).").

### 3. Sanctions under this Court's inherent authority to sanction misconduct

"[B]ankruptcy courts enjoy the same inherent authority invested in all Article III courts to

sanction parties for improper conduct." *Lowe v. Ransier* (*In re Nicole Gas Prod., Ltd.),* 581 B.R.

843, 855 (B.A.P. 6th Cir. 2018) (citing *Mapother & Mapother, P.S.C. v. Cooper (In re Downs)*,

103 F.3d 472, 477 (6th Cir. 1996)). In *In re Mehlhose*, 469 B.R. 694 (Bankr. E.D. Mich. 2012),

this Court discussed the existence and the scope of a bankruptcy court's inherent power to award

sanctions for improper conduct:

> In *John Richards Homes Bldg. Co., L.L.C. v. Adell* (*In re John
> Richards Homes Bldg. Co.*, *L.L.C.*), 404 B.R. 220, 226-27 (E.D.
> Mich. 2009), the court discussed the scope of a bankruptcy court's
> inherent power to issue sanctions as follows:
>
>> Bankruptcy courts, like all courts, have an inherent
>> power to issue sanctions, as explained by the United
>> States Supreme Court in the *Chambers* case. *See
>> Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111

S.Ct. 2123, 115 L.Ed.2d 27 (1991) ("Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates.") (quoting *Anderson v. Dunn*, 19 U.S. 204, 6 Wheat. 204, 227, 5 L.Ed. 242 (1821)). The Sixth Circuit Court of Appeals has similarly stated that "[b]ankruptcy courts, like Article III courts, enjoy inherent power to sanction parties for improper conduct." *Mapother & Mapother, P.S.C. v. Cooper* (*In re Downs*), 103 F.3d 472, 477 (6th Cir.1996). . . . [T]he inherent power to issue sanctions is not limited to only those instances where a party violates a court order. "The federal courts' inherent power to protect the orderly administration of justice and to maintain the authority and dignity of the court extends to a full range of litigation abuses." *Mitan v. Int'l Fid. Ins. Co.*, 23 Fed.Appx. 292, 298 (6th Cir.2001) (ruling that a court can award sanctions "when bad faith occurs").

The United States Court of Appeals for the Ninth Circuit likewise recognized a bankruptcy court's inherent authority to issue sanctions for misconduct:

A bankruptcy court's inherent power allows it to sanction "bad faith" or "willful misconduct," even in the absence of express statutory authority to do so. It also "allows a bankruptcy court to deter and provide compensation for a broad range of improper litigation tactics."

The inherent sanction authority differs from the statutory civil contempt authority in at least two ways. First, with the inherent power, a bankruptcy court may sanction a "broad range" of conduct, unlike the "[c]ivil contempt authority[, which only] allows a court to remedy a violation of a specific order (including 'automatic' orders, such as the automatic stay or discharge injunction)." Second, unlike the civil contempt authority, "[b]efore imposing sanctions under its inherent sanctioning

33

S.Ct. 2123, 115 L.Ed.2d 27 (1991) ("Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates.") (quoting *Anderson v. Dunn*, 19 U.S. 204, 6 Wheat. 204, 227, 5 L.Ed. 242 (1821)). The Sixth Circuit Court of Appeals has similarly stated that "[b]ankruptcy courts, like Article III courts, enjoy inherent power to sanction parties for improper conduct." *Mapother & Mapother, P.S.C. v. Cooper* (*In re Downs*), 103 F.3d 472, 477 (6th Cir.1996). . . . [T]he inherent power to issue sanctions is not limited to only those instances where a party violates a court order. "The federal courts' inherent power to protect the orderly administration of justice and to maintain the authority and dignity of the court extends to a full range of litigation abuses." *Mitan v. Int'l Fid. Ins. Co.*, 23 Fed.Appx. 292, 298 (6th Cir.2001) (ruling that a court can award sanctions "when bad faith occurs").

The United States Court of Appeals for the Ninth Circuit likewise recognized a bankruptcy court's inherent authority to issue sanctions for misconduct:

A bankruptcy court's inherent power allows it to sanction "bad faith" or "willful misconduct," even in the absence of express statutory authority to do so. It also "allows a bankruptcy court to deter and provide compensation for a broad range of improper litigation tactics."

The inherent sanction authority differs from the statutory civil contempt authority in at least two ways. First, with the inherent power, a bankruptcy court may sanction a "broad range" of conduct, unlike the "[c]ivil contempt authority[, which only] allows a court to remedy a violation of a specific order (including 'automatic' orders, such as the automatic stay or discharge injunction)." Second, unlike the civil contempt authority, "[b]efore imposing sanctions under its inherent sanctioning

33

authority, a court must make an explicit finding of
bad faith or willful misconduct." "[B]ad faith or
willful misconduct consists of something more
egregious than mere negligence or recklessness."

"Because of their very potency, inherent
powers must be exercised with restraint and
discretion." *Chambers*, 501 U.S. at 44, 111 S.Ct.
2123.

*Price v. Lehtinen* (*In re Lehtinen*), 564 F.3d 1052, 1058-59 (9th
Cir. 2009)(citations omitted).

Federal courts, including bankruptcy courts, have the
discretion to award attorney fees and expenses as a sanction for
misconduct under their inherent authority. The United States
Supreme Court, in *Chambers v. NASCO, Inc.*, explained the
circumstance under which a federal court may award attorney fees
as a sanction:

[A] court may assess attorney's fees when a party
has "'acted in bad faith, vexatiously, wantonly, or
for oppressive reasons.'" In this regard, if a court
finds "that fraud has been practiced upon it, or that
the very temple of justice has been defiled," it may
assess attorney's fees against the responsible party,
as it may when a party "shows bad faith by delaying
or disrupting the litigation or by hampering
enforcement of a court order[.]" The imposition of
sanctions in this instance transcends a court's
equitable power concerning relations between the
parties and reaches a court's inherent power to
police itself, thus serving the dual purpose of
"vindicat[ing] judicial authority without resort to
the more drastic sanctions available for contempt of
court and mak[ing] the prevailing party whole for
expenses caused by his opponent's obstinacy."

We discern no basis for holding that the
sanctioning scheme of the statute and the rules
displaces the inherent power to impose sanctions for
the bad-faith conduct described above. These other
mechanisms, taken alone or together, are not

34

substitutes for the inherent power, for that power is both broader and narrower than other means of imposing sanctions. First, whereas each of the other mechanisms reaches only certain individuals or conduct, the inherent power extends to a full range of litigation abuses. At the very least, the inherent power must continue to exist to fill in the interstices.

501 U.S. 32, 45-46 (1991)(citations and footnote omitted); *see also Knowles Bldg. Co. v. Zinni*, (*In re Zinni*), 261 B.R. 196, 203 (B.A.P. 6th Cir. 2001)(citation omitted)("It should also be noted that federal courts, including the bankruptcy court, have the inherent power to impose sanctions on a scope broader than that of Bankruptcy Rule 9011, including monetary sanctions."); *Miller v. Cardinale* (*In re DeVille*), 361 F.3d 539, 551, 553 (9th Cir. 2004)(affirming the decision of the Bankruptcy Appellate Panel for the Ninth Circuit, which affirmed a bankruptcy court's award of all reasonable attorney fees and costs as a sanction under the bankruptcy court's inherent authority); *Schwartz v. Kujawa* (*In re Kujawa*), 256 B.R. 598, 610 (B.A.P. 8th Cir. 2000), *aff'd in part, rev'd in part, on other grounds,* 270 F.3d 578 (8th Cir. 2001)(acknowledging a bankruptcy court's inherent authority to award attorney fees as a sanction for misconduct "despite the existence of procedural rules which sanction the same conduct," and stating that "such rules, such as Rule 11, are not substitutes for the inherent power").

469 B.R. at 709-10.

The United States Supreme Court recently reaffirmed the inherent authority of federal courts to sanction a litigant for bad-faith conduct, in *Goodyear Tire & Rubber Co. v. Haeger*, 137 S.Ct. 1178 (2017):

Federal courts possess certain "inherent powers," not conferred by rule or statute, "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." That authority includes "the ability to fashion an appropriate sanction for conduct which abuses the judicial process." And one permissible sanction is an "assessment of attorney's fees"—an order . . . instructing a party that has acted in bad faith to reimburse legal fees and costs

35

incurred by the other side.

137 S.Ct. at 1186 (citations omitted).  But the Supreme Court held that such sanctions must be "limited to the fees the innocent party incurred solely because of the misconduct—or put another way, to the fees that party would not have incurred but for the bad faith." *Id.* at 1184. Nonetheless, a court "has broad discretion to calculate fee awards under that standard." *Id.*

**4.  Sanctions under Bankruptcy Code § 105(a)**

Finally, the Court has authority under Bankruptcy Code § 105(a) to sanction attorneys for misconduct:

> Under Section 105(a), a bankruptcy court may issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. The power granted in Section 105(a) carries with it the authority to "award attorney fees as a sanction for misconduct." *In re Mehlhose*, 469 B.R. 694, 711 (Bankr. E.D. Mich. 2012).

*Lowe v. Ransier* (*In re Nicole Gas Prod., Ltd.*), 581 B.R. 843, 855 (B.A.P. 6th Cir. 2018).  As this Court has previously held:

> A bankruptcy court's statutory equitable authority under § 105(a) is "broad." *In re Dow Corning Corp.*, 280 F.3d 648, 656 (6th Cir. 2002).  It exceeds the equitable authority available under "traditional equity jurisprudence." *Id.* at 658.  However, such power is not limitless and must not be exercised in a way that is inconsistent with the Bankruptcy Code. *Id.*; *see also Gold v. Winget* (*In re NM Holdings Co., LLC*), 407 B.R. 232, 273 (Bankr. E.D. Mich. 2009).
> . . .
>
> Section 105(a) provides bankruptcy courts with authority to award attorney fees as a sanction for misconduct. *See, e.g., Greenbelt v. Richard Potasky Jeweler, Inc.* (*In re Richard Potasky Jeweler, Inc.*), 222 B.R. 816, 829 (S.D. Ohio 1998)(citations omitted)("a bankruptcy court may award attorney fees to a corporate debtor pursuant to § 105(a), even though the court would

36

be unable to accomplish the same task under § 362(h)" and "every court that has considered the issue has found that § 105(a) provides the bankruptcy court with the power to award attorney's fees as a means of enforcing the automatic stay"); *In re Dental Profile Inc.*, 446 B.R. 885, 906-07 (Bankr. N.D. Ill. 2011)("[W]here a party unreasonably prolongs litigation, it is within the court's [§ 105(a)] authority to require that party to pay attorneys' fees."); *Grochocinski v. Spehar Capital, LLC (In re CMGT, Inc.)*, 458 B.R. 473, 492 (Bankr. N.D. Ill. 2011)(internal quotation marks and citation omitted)("Sanctions are justified under § 105(a) where the sanctioning court has clearly found that a litigant intentionally abused the judicial process in an unreasonable and vexatious manner. Where a party unreasonably prolongs litigation, it is within the court's inherent equitable authority to require that party to pay attorneys' fees.")

*Mehlhose*, 469 B.R. at 710-11.

## C. Application of applicable law to the facts of this case

The Court declines to sanction Sandweiss or the Sandweiss Law Firm, for the following reasons.

**First**, the Court will not award Huntington any relief under Fed. R. Bankr. P. 9011. This is because Sandweiss did not sign and file the bankruptcy petition, or any other paper in this bankruptcy case, for "any improper purpose," or otherwise in violation of Rule 9011(b). And to the extent Sandweiss allegedly violated Rule 9011(b) by filing anything other than the bankruptcy petition, Rule 9011(c)(1) does not authorize any relief in this case. This is because Huntington did not comply with the 21-day safe harbor provision of Rule 9011(c)(1)(A), by serving its Sanctions Motion on Sandweiss at least 21 days before filing it, and the Court has not chosen to initiate proceedings under Rule 9011(c)(1)(B).

**Second**, the Court cannot and will not sanction Sandweiss or the Sandweiss Firm, in any event, for Sandweiss's conduct in the Hana Gorges Bankruptcy or in the state court Eviction

Case.  The Sanctions Motion is brought only in this bankruptcy case, not in any other case.  No

such motion was filed in the Hana Gorges Bankruptcy.  And that case was only pending for 15

days before being dismissed by the Court.  Huntington filed nothing in the Hana Gorges

Bankruptcy, except a notice of appearance,[54] and Huntington was not reasonably required to file

anything in the Hana Gorges case before the Court dismissed the case.  In any event, any

sanctions relief on Huntington's Sanctions Motion must be limited to sanctions for improper

conduct in *this* case, if any.

**Third**, this Court has no jurisdiction, authority, or inclination to sanction Sandweiss or

the Sandweiss Firm for Sandweiss's conduct in defending the Gorges family in the state court

Eviction Case.  That is a matter of concern only for the state court, not this Court.  Huntington

has cited no authority that supports its argument that this federal bankruptcy court may sanction

an attorney for his conduct in defending a client in a state court lawsuit, particularly one that was

*settled* by a consent judgment.[55]  This Court is aware of no such authority.

---

[54]  Docket # 17 in Case No. 14-42250.

[55]  Huntington's attorney cited three cases in support of this argument, in his opening statement
at the evidentiary hearing.  (Hearing Tr. (Docket # 150) at 24-28).  The cases are *Prince v. MacDonald*,
602 N.W.2d 834 (Mich. Ct. App. 1999); *Nat'l Home Equity Corp. v. Villareal* (*In re Villareal*), 46 B.R.
284 (Bankr. C.D. Calif. 1984); and *In re Royal Manor Mgt., Inc.*, 525 B.R. 338 (B.A.P. 6th Cir. 2015),
*aff'd*, 652 F.App'x 330 (6th Cir. 2016).  None of these cases support Huntington's argument, that a
federal bankruptcy court may sanction an attorney for his conduct in a state court case.  Two of these
cases, *Villareal* and *Royal Manor Mgt.*, involved sanctions against an attorney only for litigation conduct
in the case at hand.  In *Villareal* the sanction was $500.00 for the filing of the petition in that Chapter 7
case, in bad faith and for the sole purpose of delaying a foreclosure sale, although the court noted that the
debtor had filed two prior Chapter 13 cases for the same purpose.  In *Royal Manor Mgt.*, all of the
attorney's sanctioned conduct occurred in that same bankruptcy case.

In the third case cited by Huntington, *Prince v. MacDonald*, the Michigan Court of Appeals
affirmed a sanction against two defendants, based on Michigan sanctions law, for the action by one of
them in filing a bankruptcy petition on the eve of trial in the state court case, in bad faith and solely for
the purpose of delaying the state court case.  The *Prince* case was decided under the state law of

38

That is not to say that in deciding the Sanctions Motion in this case, the Court cannot consider evidence about the actions of Sandweiss and his clients in the Hana Gorges Bankruptcy and in the state court Eviction Case. Such evidence may be relevant to support (or rebut) Huntington's claim that *this* bankruptcy case was filed in bad faith and for an improper purpose. In deciding that issue, this Court has considered all such evidence.

**Fourth**, the Court will not sanction the Sandweiss Firm, in any event, for the following two reasons: (1) because the Sanctions Motion did not seek or request sanctions against the law firm; rather, only against Sandweiss individually; and (2) because, at least with respect to sanctions under 28 U.S.C. § 1927, only individual lawyers may be sanctioned; law firms cannot be sanctioned. See Part III.B.1 of this Opinion, quoting *Rentz v. Dynasty Apparel Indus., Inc.*, 556 F.3d 389, 396 n.6 (6th Cir. 2009).

**Fifth and finally**, the Court will not sanction Sandweiss or the Sandweiss Firm for the additional reason that Huntington has not met its burden of proving, by a preponderance of the evidence, any valid basis for sanctions. Whether considered under Bankruptcy Code § 105(a) and this Court's inherent authority to sanction misconduct, or under 28 U.S.C. § 1927, or under Federal Bankruptcy Rule 9011(b), the Court finds no grounds for sanctions. Rather, the Court finds that Sandweiss and the Sandweiss Firm did not act improperly or in bad faith, or abuse the bankruptcy system, in filing and prosecuting this bankruptcy case for Gorges. Sandweiss did not "multiply the proceedings" in this case "unreasonably and vexatiously," within the meaning of § 1927. And in the words of the § 1927 cases quoted in Part III.B.1 of this Opinion, Sandweiss's

Michigan regarding sanctions. The case therefore is distinguishable; this case concerns only the federal law of sanctions, which is discussed at length in Part III.B. of this Opinion.

conduct in this case was not in any respect "objectively unreasonable." Nor were any of Sandweiss's actions done in bad faith, or when Sandweiss "kn[ew] or reasonably should [have] know[n] that the claim or litigation tactics pursued [were] frivolous or [would] impede the litigation of proper claims."

Rather, the Court's findings stated in this Opinion show that Sandweiss filed the bankruptcy petition in this case in good faith and for a permissible purpose. And the same is true for Sandweiss's other conduct in this bankruptcy case, including his defense against Huntington's stay-relief/dismissal motion.

Sandweiss filed this bankruptcy case to help Gorges try to resolve the title issue described in Parts III.A.3 and III.A.4 of this Opinion, and he had a good faith, reasonable, and legitimate bankruptcy-related basis for helping Gorges take advantage of the automatic stay and the 60-day extension under Bankruptcy Code § 108(b) of the Settlement Agreement payment deadlines.

And based on the facts described in Part III.A.5 of this Opinion, the Court finds that there is nothing sanctionable in Sandweiss's conduct after he filed this bankruptcy case. It is true, as the Court has found, that after filing the bankruptcy petition, Sandweiss did not make any further requests to Huntington to title the Real Property in the name of Krystal Gorges. But given the arguments and position taken by Huntington beginning immediately after the petition was filed, it was clear to Sandweiss, and is clear to this Court, that further efforts to negotiate with Huntington over this title issue would have been futile. This is clear from Huntington's stay-relief/dismissal motion filed only 6 days after the petition, and from the arguments of Huntington's counsel during the expedited hearing on that motion, held only 29 days after the petition date.

Sandweiss's conduct in defending against Huntington's stay-relief/dismissal motion was entirely reasonable and in good faith. The Court's ruling on that motion gave Gorges only until February 17, 2015 to pay Huntington the $410,000 purchase price under the Settlement Agreement, or suffer relief from stay and the resulting loss of possession of the Real Property. Sandweiss did not learn until at least February 9, 2015 that the Gorges family had decided not to pay the purchase price, and instead move out of the property. At that point, there was nothing Sandweiss reasonably could do but wait for the February 17, 2015 deadline to pass without payment, and for the resulting stay-relief order to be entered, as it was, on February 18, 2015. The Gorges family moved out of the Real Property on February 16 or 17, 2015. Very soon thereafter, on March 4, 2015, Sandweiss filed on Gorges's behalf a motion to voluntarily dismiss this bankruptcy case, and the case was dismissed.

Finally, there is nothing sanctionable in Sandweiss's conduct after the dismissal of this case, in opposing Huntington's Sanctions Motion. Indeed, Sandweiss has now prevailed on that motion.

It is, of course, very unfortunate and terribly unjust if Gorges and/or members of his family deliberately caused extensive physical damage to the Real Property before they vacated it, as appears to be the case. Huntington has every reason to be outraged by this, and Huntington obtained a $78,000.00 default judgment against Gorges for this. But this is not a basis under the law for sanctioning the Debtor Gorges's attorney, Sandweiss, in this case.

## IV. Conclusion

For the reasons stated in this Opinion, the Court will enter an Order denying the Sanctions Motion.

41

**Signed on October 12, 2018**



/s/ Thomas J. Tucker
_____
**Thomas J. Tucker**
**United States Bankruptcy Judge**